**BIG TOP USA, INC., Plaintiff,**

v.

**THE WITTERN GROUP; Fawn Vendors, Inc. d/b/a Selectivend National; O.K. Manufacturing; John Schofield; Sam's Club, a division of Wal–Mart Stores, Inc.; and Wal–Mart Stores, Inc., Defendants.**

**No. CIV. A. 97–10316–PBS.**

United States District Court, D. Massachusetts.

Nov. 20, 1998.

Robert E. McLaughlin, Jr., Gilman, McLaughlin & Hanrahan, Boston, MA, Kenneth M. Levine, Mitchell J. Notis, Ross Annenberg, Billet, Rigopoulos & Levine, Boston, MA, Deborah C. Frankel, Big Top USA, Inc., Everett, MA, for Big Top USA, Inc., Plaintiffs.

John Egan, Posternak, Blankstein & Lund, Boston, MA, Hayward L. Draper, Hansell & O'Brien, Des Moines, IO, John B. Tuffnell, Nyemaster, Goode, Voigts, West, Hansell & O'Brien, Des Moines, IO, for Wittern Group, Fawn Vendors, Inc. dba Selectivend National, Defendants.

Charles M. Furcolo, Curley & Curley, Boston, MA, John Egan, Posternak, Blankstein & Lund, Boston, MA, Andrew P. Botti, Burns & Levinson, Boston, MA, Blake T. Ostler, Burbidge, Carahan, Ostler & White, Salt Lake City, UT, Michael R. Byrne, Melick & Porter, Boston, MA, for O.K. Manufacturing, Defendant.

John Egan, Posternak, Blankstein & Lund, Boston, MA, Hayward L. Draper, Hansell & O'Brien, Des Moines, IA, for John Schofield, Defendant.

Richard E. Quinby, Janice O. Fahey, Craig & Macauley, P.C., Boston, MA, Jon B. Comstock, Wal–Mart Stores, Inc., Bentonville, AR, for Wal–Mart Stores, Inc., Sam's Club, Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This has been an uncivil action. Plaintiff Big Top USA, Inc. ("Big Top") claims that the defendants stole Big Top's design for a gumball amusement machine in January 1997 and, as a result, have nearly driven the company out of business. Big Top asserts that O.K. Manufacturing ("O.K.") makes two machines that are knock-offs of its machine, that Selectivend National ("Selectivend") conspired in the knock-off, and that Wal–Mart Stores, Inc. ("Wal–Mart") joined in the conspiracy and breached an agreement to place Big Top Gumball Machines in its stores and in a catalog published by its division Sam's Club.[1]

All defendants move for the sanction of dismissal based on the violation of numerous discovery orders by the plaintiff and the incivility of the discovery process.

After hearing, the motions to dismiss of Wal–Mart and Selectivend are *ALLOWED*. The pending summary judgment motions of Wal–Mart and Selectivend are moot. Because of its own missteps in the discovery process, O.K.'s motion to dismiss is *DENIED*.

### BACKGROUND

Big Top's First Amended Complaint asserts a number of state tort claims and a federal claim for trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a). Big Top moved for a preliminary injunction on all counts to enjoin the manufacture, sale and distribution of O.K.'s two machines and to require the removal of O.K.'s machines from Wal–Mart stores. Four evidentiary hearings followed during the summer and fall of 1997. In an extensive opinion focused on the difficult legal question of protecting trade dress in product configuration cases under the Lanham Act, this Court denied Big Top's

---

1. The term "Selectivend" refers also to defendants John Schofield, Fawn Vendors, Inc., and The Wittern Group. The term "Wal–Mart" refers also to defendant Sam's Club, a division of Wal–Mart Stores, Inc.

motion on February 6, 1998. *See Big Top USA, Inc. v. The Wittern Group*, 998 F.Supp. 30, 55 (D.Mass.1998). The facts of this dispute are adequately detailed in the Court's memorandum published in conjunction with that motion and will not be repeated here. *See id.* at 33–41.

Discovery began in earnest after the Court's order. Sharp disputes followed immediately. O.K. filed a motion to compel Big Top to produce a wide range of documents it had requested in August 1997. Big Top fired back, asserting that O.K. had also failed to produce. Additionally, Wal–Mart filed a motion to compel Big Top to comply with its Rule 30(b)(6) deposition subpoena, which included a schedule of topics for a 30(b)(6) deponent and a schedule of documents pursuant to Rule 30(b)(5) that overlapped substantially with O.K.'s request for production.

The discovery motions were referred to Chief Magistrate Judge Alexander. Just before she heard the motions, this Court, at a conference on February 18, 1998, set the following schedule in accordance with Local Rule 16.1(F): fact discovery to be completed by March 31, 1998; dispositive motions to be filed by April 17, 1998; and trial on June 1, 1998. The case was placed on this aggressive schedule primarily at plaintiff's instance because Big Top insisted that only a trial in the near-term would find the company still in business. Sympathetic to this position, the Court pushed the parties toward a firm trial date. A contentious and bitter discovery hearing before the magistrate judge was held immediately after the scheduling conference, and she promised a quick ruling in keeping with the demands of the schedule.

Magistrate Judge Alexander announced her rulings on the motions in a telephone conference just eight days later, on February 26, and in a written memorandum and order on February 27. In a clearly written, detailed and well-reasoned opinion, she allowed both defendants' motions to compel virtually in their entirety. The magistrate judge ordered Big Top to produce four types of documents that she found were relevant to this litigation and had been properly requested by O.K. First, she ordered Big Top to comply with twelve specific document requests "relating to Big Top's customer list and the sales Big Top has made."[2] Big Top had challenged the relevance of the requested documents, but the magistrate judge flatly rejected the objection because of O.K.'s "right to documents that may disprove the alleged overlap [in customer markets] or minimize Big Top's damages." (M.J. Order at 10.) Second, in accordance with another specific request of O.K., the magistrate judge ordered Big Top to produce all documents relating to the Big Top Gumball Machine's performance. Third, the magistrate judge ordered Big Top to produce all documents "relat[ing] to the design, development, or manufacture of the Big Top Gumball vending machine." Fourth, she ordered Big Top to produce all communications and correspondence relating to this litigation, notwithstanding Big Top's stance that it refused to show the defendants any documents at all until it was satisfied that the defendants had given Big Top everything it deserved.

Magistrate Judge Alexander's order regarding Wal–Mart's motion to compel 30(b)(6) testimony and documents was no less specific. She ordered Big Top to produce at a 30(b)(6) deposition, *inter alia*, "[a]ll documents in Plaintiff's possession, custody or control relating to the purchase and sale of each and every Big Top Gumball Machine." The only documentary portion of Wal–Mart's motion to compel that the magistrate judge denied was its request for state and federal tax returns, because the company

---

**2.** Most significant among the document requests with which the magistrate judge specifically ordered compliance were the following: (1) "[a]ll documents which represent, reflect, relate to or evidence the name, address, telephone number and/or identity of any person or entity that ordered or otherwise purchased a Big Top gumball vending machine at any time and the date that such order was made, the date the sale was consummated and the date the order was filled,"; (8) "all documents which represent, reflect or relate to any damages which you claim to have incurred as a result of the actions of O.K. Manufacturing as set forth in your Amended Complaint"; and (18) "[a]ny and all documents evidencing, reflecting, constituting or regarding any and all purchase orders, invoices, letters of intent, bills of lading, bills of sale, and like documents showing sales, shipments, and sales prices of the Big Top gumball machine."

could obtain the same information that was on the tax returns from other documents to which the order entitled it. She also required Big Top to produce "a deponent who will testify as to matters" relating to the machine's "performance history," Big Top's "total gross revenue and expenditures related to the manufacture and sale of the Big Top Gumball Machine from 1994 to present," and manufacture and sale information including the "total number of machines produced, the total number of machines ordered, the total number of machines sold, the name and address of each and every buyer, and purchase price thereof."

Big Top designated its Chairman and Director of Product Development, Bill Ranney, Sr. ("Ranney Sr."), as its 30(b)(6) deponent. He was deposed in Boston on March 4, 1998. Big Top produced no documents pursuant to the magistrate judge's order prior to the deposition, and Ranney Sr. brought none with him. He also refused to answer questions, for example, about the names of people manufacturing the machines; the number of machines manufactured per week and month; the names of customers cancelling orders because they bought machines from O.K.; the names of people who refused to purchase Big Top machines because of out-of-order signs on O.K.'s Circus World machines, which the potential customers mistakenly believed were Big Top machines; and litigation with a disgruntled customer. (Ranney Sr. Mar. 4 Dep. Tr. at 190:3–16; 226–28).[3]

On March 5, 1998, Magistrate Judge Alexander had to intervene in the deposition by phone after Ranney Sr.'s repeated refusal to answer questions, including questions about his criminal conviction. Three times she ordered Big Top's counsel, Deborah Frankel, to note her objections and let the questioning proceed. Frankel, a member of the bar for twelve years who has since moved out of the country, pronounced that she would not comply and would appeal. The magistrate judge documented the intervention in writing on March 6: "At telephonic conference held on March 5, 1998 this Court ordered Plaintiff's counsel to allow her witnesses to answer the questions notwithstanding her objections, and that the deposition should continue."

Nevertheless, Frankel terminated the continuation of Ranney Sr.'s deposition on the morning of March 6 because O.K. had not produced documents. At that point Selectivend's counsel, Hayward Draper, was taking the deposition. Frankel instructed Ranney not to answer any questions about the cost and pricing of the Big Top Gumball Machine. She walked out of the deposition although Wal–Mart's counsel, Jon B. Comstock, asked that she remain because he was trying to call the magistrate judge to resolve the matter so that the deposition might proceed. Frankel also did not return with Ranney, the President of Big Top, that afternoon for the continuation of his deposition. The three counsel for defendants had flown into Boston to take these depositions.

Predictably, the early March depositions prompted numerous motions to impose discovery sanctions, including motions to dis-

---

3. The transcript contains a number of examples of improper refusal to answer proper questions. *See* Ranney Sr. Mar. 4 Dep. Tr. at 36:7–8 ("I don't want to tell you anything about our company."); *id.* at 45:24 through 46:2 ("We don't see it, those questions you're asking, as relevant to the charges that have been raised."); *id.* at 220:5–20 (responding, when asked to name which customers had called to cancel orders, "I could, but I don't want to"); *see also* Dkt. # 171, Exs. E & F. The transcript also contains examples of improper coaching and comments by Big Top attorney Deborah Frankel. *See* Ranney Sr. Mar. 4 Dep. Tr. at 270:21 through 271:15 ("He basically wants to show that the statement you made about the customers is that they were satisfied customers ... that it wasn't fraudulent and they didn't tell a lie. That's where he is going with this. Do you see it? ... Did you hear what I said? ... They don't want you to hear, Bill, what I said."); *id.* at 315:1–3 ("Orlando."); *id.* at 316:8–11 ("You couldn't afford—"); *id.* at 317:16–17 ("Wal–Mart."); *id.* at 335:11–12 ("David Graham."); *see also* Dkt. # 171 Exs. G & H. The transcript also reflects Frankel's incivility. *See* Ranney Sr. Mar. 4 Dep. Tr. at 155:6–16 ("I'm real worried about your patience when your client is a thief and you have the nerve to go after my client .... I'm afraid of you threatening with sanctions. I'm shaking here in my boots."); *id.* at 156:14–21 ("Of course, you would. You're the type of person who instructs your law firm to call and make lies to customers. You'll do any dirty thing to try to save yourself when you know you're in cahoots with all the other defendants. I don't think any [sic] highly of you, Mr. Draper."); *id.* at 214:19 ("What is the anal retent[ive] fixation on it?"); *see also* Dkt. # 171 Ex. I.

miss by Wal–Mart and Selectivend. With a mind toward keeping the litigation on track, this Court ruled (without hearing) in an order issued on March 18. Despite finding that Big Top had violated at least one clear court order issued by Magistrate Judge Alexander, the Court denied the motions to dismiss without prejudice. However, the Court sanctioned Big Top by ordering it to pay for continued depositions of Ranney Sr., its 30(b)(6) designee (one full day), and Ranney Jr. (one half day).[4] It also explicitly ordered that all "documents requested pursuant to Rule 30(b)(6)," the production of which the magistrate judge had already specifically compelled, "shall be produced forthwith."

My March 18 order also included several provisions regarding attorney and party behavior. Ranney Sr. was "ordered to answer all questions regarding non-privileged information in accordance with Rule 30(c)." Attorney Frankel was ordered to "conduct herself in accordance with the Massachusetts Rules of Professional Conduct and the Federal Rules of Civil Procedure." She was specifically instructed that "she shall not coach her clients' testimony and shall refrain from her uncivil comments during the course of these depositions." I ordered: "During the depositions, Attorney Frankel shall make no comments about the testimony other than objecting or, in appropriate instances, instructing a client not to answer." The Court warned that, "[s]hould Big Top fail to comply with the above applicable orders without good cause prior to the discovery deadline of March 31, 1998, the Court will examine more severe sanctions on Big Top under Rule 37(b)(2), potentially including dismissal of its entire case or testimony preclusion."

Relations hardly warmed, and discovery compliance remained a problem. Depositions of the Ranneys were rescheduled for March 27 and 28. No more documents were produced by Big Top or Wal–Mart following the order. On March 26, I was forced to intercede yet again because of Big Top's squabbling over the wording of a standard protective order. Although the record is not entirely clear, the main bone of contention appeared to be that Big Top wanted express language that confidential documents could be used at trial. Wal–Mart states that it cured this objection on March 24, 1998. Frankel did not inform Wal–Mart or this Court as to the basis for any continuing objections to Wal–Mart's proposed order. On March 25, 1998, Big Top faxed an emergency motion to the Court that sought to hold Wal–Mart in contempt for failing to sign Big Top's version of the protective order, but Frankel never disclosed to the Court that Wal–Mart had faxed a signed protective order to her that it believed cured her objection. Through my clerk, I instructed the parties as follows: "I ORDER all parties to produce all responsive documents forthwith. I further order that only counsel may see the documents until a mutually acceptable protective order is agreed upon or ordered by Judge Alexander. It shall not be an acceptable reason for nonproduction that another party has not produced."

Though some defendants' counsel came to Boston a day early to review documents before the depositions, Big Top still refused to turn over documents. By this point, Selectivend and Wal–Mart had fully complied. Even on the morning of the March 27 half-day deposition of Ranney Jr., Frankel consumed forty-five minutes of deposition time placing conditions on Big Top's disclosures, including requiring "stipulations" consistent with her own view of the appropriate wording of a protective order before any documents would be turned over. For example, Frankel insisted on a stipulation that, "if any questions [were] directed to documents being produced [that day], the entire transcript [could] not be shared with the clients" until a protective order was signed. (Ranney Jr. Mar. 27 Dep. Tr. at 11:2–4.) Frankel said that if the parties refused to agree to her exact wording, "[w]e will be producing the documents to the Court and we won't give them to you today." *Id.* at 9:15–17. Frankel eventually handed defendants an eight-inch-thick, 883-page pile of documents[5] and an-

---

4. This, as it turns out, was a hollow sanction, as Big Top claims it is without funds to pay.

5. Defendants claim that Big Top produced only sixteen pages of purchase orders despite its testi-

nounced that the deponent and she were leaving promptly at 5:30 p.m. She declined to stay later although the dispute over stipulations caused a forty-minute delay and counsel had no time to review the documents. Frankel was pressing the half-day limitation imposed by the Court.

The deposition itself was characterized by the same type of behavior by Big Top that had characterized the previous ones: caustic comments, improper coaching and verbose objections by counsel.[6] The difference this time around was that Ranney Jr. claimed ignorance of basic information (i.e., the stock ownership of Big Top, his compensation, when the first machine was sold, price and profit information, etc.), rather than refusing outright to answer as he had before.

The 30(b)(6) deposition, held on March 28, was marred by the same recalcitrance in providing the information compelled by the court order. Like his son, Ranney Sr. claimed not to know answers to questions that he had previously refused to answer about his company or that he said would require him to check his records in the first round of depositions.[7] He also referred to Gary Roberts of Big Top as the man who would have most of the financial information required, a claim he made for the first time during this deposition. Gary Roberts, however, was not designated as a 30(b)(6) witness and was never produced by Big Top for deposition. Significantly, Ranney Sr. acknowledged that he had not produced all the purchase orders. (Ranney Sr. Mar. 28 Dep.

Tr. at 54:19–24.) Improper comments, coaching, and objections by counsel continued.[8] In effect, the defendants were only marginally farther along in the discovery process than they had been as of the March 18 order.

Wal–Mart and Selectivend, in yet another barrage of motions, renewed their request that the Court dismiss Big Top's complaint against them or, alternatively, impose other stern sanctions. O.K. moved to dismiss as well.

## DISCUSSION

### A. Violations of Rule 37

■ Discovery sanctions are covered by Fed. R. Civ. Proc. 37, which reads, in pertinent part:

> If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) ... fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule ..., the court in which the action is pending may make such orders in regard to the failure as are just, and among the orders the following:
>
> ...
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or *dismissing the action or proceeding or any part thereof,* or rendering a judgment by default against the disobedient party ....

---

mony that it sold over four hundred machines. No invoices were produced.

**6.** For example, there was a dispute over the meaning of my court order on March 26. Frankel told Wal–Mart's attorney, John B. Comstock: "You have a bad attitude, unfortunately. You've basically turned this whole thing into an ego trip, and I really feel kind of sorry for you." (Ranney Jr. Mar. 27 Dep. Tr. at 19:20–23.) She accused Heyward Draper of "being the better actor" of the two, *id.* at 25:1–5, and of "childish questioning," *id.* at 37:17, and both attorneys of harassing the witness, *see id.* at 46:10. In the deposition of Michael J. Converso, she accused O.K.'s attorney: "I think you have a lot of nerve asking a question like that. It shows how you, again, do everything below the belt, you don't fairly try to win the case, you try to do it unfairly." (Converso Apr. 23 Dep. Tr. at 164:16–22.) She later

said, "You sicken me because you totally make crap up as you go along." *Id.* at 277:10–25.

**7.** For example, Ranney Sr. had never looked at or provided quarterly financials to determine net profit or loss, had never determined the names of Big Top employees, and had never calculated the number of machines sold.

**8.** *See* Ranney Sr. Mar. 28 Dep. Tr. at 36:21–24 ("I don't know exactly why you are the consummate actor because your pretense is not necessary."); *id.* at 7:12–24 ("That's ridiculous. Again, you've misstated the record. You have a lot of nerve, Mr. Draper."). For other examples of improper coaching and comments, see Ranney Jr. Mar. 27 Dep. Tr. at 82:15–19; 84:6–11; 86:1–8; 110:9–11; 111:14–23; 139:1–5; 141:2–13; 199:9–21; 154:12–13.

Fed.R.Civ.P. 37(b)(2) (emphasis added). "The rule's language clearly requires two things as conditions precedent to engaging the gears of the rule's sanction machinery: a court order must be in effect, and then must be violated, before the enumerated sanctions can be imposed." *R.W. Int'l Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir.1991); *see also United States v. One 1987 BMW 325*, 985 F.2d 655, 660 (1st Cir.1993). If, after a court order on a motion to compel, "the plaintiffs ... refuse[ ] to comply with the specific order for production, sanctions [can] appropriately [be] imposed under Rule 37(b)(2)." *R.W. Int'l*, 937 F.2d at 19.

 Dismissal with prejudice is a harsh sanction that runs counter to the strong policy in this circuit favoring disposition on the merits. *See Figueroa Ruiz v. Alegria*, 896 F.2d 645, 647 (1st Cir.1990) (citing cases). Nonetheless, the sanction of dismissal must be available not merely to penalize egregious conduct, but also to deter such conduct. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642–43, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). Courts consider the following factors in determining the appropriate sanction: (1) the willfulness or bad faith of the noncomplying party; (2) the prejudice to the opposing party; (3) whether the procedural history indicates "protracted inaction or deliberate delay"; (4) the disregard of earlier warnings of the consequences of the misconduct; and (5) the availability of less draconian factors. *In re Selected Somersworth Bank Cases*, 148 F.R.D. 1, 4 (D.Me.1993).

### B. *Specific Violations*

██ Because of the Rule's focus on specific violations, the Court centers its discussion here on two orders in particular: (1) the wide-ranging order of the magistrate judge, reinforced by my order, to produce specific documents; and (2) my March 18 order to compel testimony of a 30(b)(6) witness.

With respect to the first violation, as of the close of discovery on March 31, Big Top had failed to provide the defendants with any meaningful document discovery after several specific court orders to do so. Magistrate Judge Alexander, in her February 27 order,

examined each element of O.K.'s document request and Wal–Mart's 30(b)(6) notice, both of which were subjects of Rule 37(a) motions to compel. She explained why each subsection of each request had relevance to the case and why Big Top must produce the requested documents forthwith. Big Top did not produce any documents, despite the fact that the 30(b)(6) deposition took place at the beginning of March. Though the magistrate judge's order was broad in scope, it was not the kind of "broad-form discovery order" that does not qualify as the threshold step for Rule 37(b) discovery sanctions. *R.W. Int'l*, 937 F.2d at 17.

On March 18, I ordered all parties to produce the documents ordered by Magistrate Judge Alexander "forthwith." "Forthwith" means "immediately; without delay; directly; within a reasonable time under the circumstances of the case; promptly and with reasonable dispatch." *Black's Law Dictionary* 654 (6th ed.1998). It does not mean nine days later, two working days before discovery closes. Yet that is exactly what happened here. Despite the order of the Court, as a sanction, to pay the costs associated with a redux of both Ranney Sr.'s 30(b)(6) deposition and Ranney Jr.'s individual deposition, Big Top produced not a single document in the nine-day interim between my order and the opening of depositions. Ranney Jr. and Frankel walked into the deposition on March 27 with a pile of documents, but even then Frankel did not allow opposing counsel to see them until she had spent forty-five minutes debating a "stipulation" governing the use of the documents.

Big Top insists that the delay was caused by a stalemate over the wording of a confidentiality agreement and that Wal–Mart was to blame. Even if this is true (and there is nothing in the record to suggest it is), the belated document disclosure itself did not comply with the magistrate judge's order. Big Top produced no routine business records, no complete customer lists, few customer purchase orders, no documents relating to costs of production or sales, and no employee lists, all of which were covered by one or both of the allowed motions to compel. Big Top produced 883 pages of documents, but

few of them were of any value. It produced pages of xeroxed business cards, nearly 500 pages of forms filled out by visitors to Big Top's booth at trade shows, 100 pages of computer lists of "visitors" to Big Top's booth at the trade shows, and 31 pages of typewritten "leads." Only a handful of purchase orders were produced (though Ranney Sr. admitted more existed), and no other documents were produced documenting production or sale of machines. A scant financial summary was produced, but Big Top turned over no actual financial business records documenting sales and costs until May 1, 1998, *after* this Court, at a hearing on April 27, 1998, ordered production again—and *after* the discovery period had terminated. The document turnover during the discovery period was unhelpful as a means of finally determining the operability of the machine or any claim for damages.

Second, Big Top violated the magistrate judge's February 27 order in that it did not provide a 30(b)(6) deponent to testify about specific aspects of its case. Big Top designated Ranney Sr. in late February as the corporate deponent, but at the early March depositions he refused to answer any questions about his company. Suddenly, after being ordered to do so first by Magistrate Judge Alexander and then by me, Ranney Sr. suffered a bout of amnesia as to the affairs of his company, specifically those particulars designated by the magistrate judge's order. During his second deposition on March 28, three days before the close of discovery and one day after the partial disclosure of Big Top documents, Ranney Sr. referred virtually all questions regarding the financial status of his company and specific proof of the amount of damages allegedly suffered by Big Top to Gary Roberts. In turn, Big Top contended that Gary Roberts was not an employee of Big Top and therefore was not under its control and, in any event, could not be deposed after the discovery cutoff. This contention is hard to credit, as Roberts is married to Ranney Sr.'s daughter and both Ranneys testified that Roberts was an employee, at least on a part-time basis. In any event, Big Top did not tell defendants that information until the 30(b)(6) deposition on March 28, 1998. The end result was that no meaningful discovery transpired on the issue of damages and gaping holes remained on key issues of liability. Big Top utterly failed to meet either of its requirements under Fed.R.Civ.P. 30(b)(6) to identify knowledgeable individuals as corporate designees or to make reasonable attempt to ascertain information reasonably available to the organization.

The Court concludes that, in at least these two ways, Big Top violated direct orders of the Court and is subject to sanctions under Rule 37(b).

C. *Overall Pattern of Conduct: Appropriate Sanction*

 Rule 37 provides the Court with a wide range of sanctions. "Discovery sanctions 'must be just,' and 'specifically related to the particular claim which was at issue in the order to provide discovery.'" *Fashion House v. K mart Corp.*, 892 F.2d 1076, 1081 (1st Cir.1989) (quoting *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)) (other internal quotations omitted). The particular orders violated by Big Top cut to the heart of this case. The Court, in its order denying the motion for preliminary injunction, highlighted several unanswered factual questions central to the resolution of liability in this dispute. Among them were the likelihood of consumer confusion and the adequacy of the performance of the Big Top Gumball Machine. *See Big Top USA*, 998 F.Supp. at 54–55. Also, the question of whether or not Big Top was capable of manufacturing significant numbers of machines and the issue of overlap of customers between Big Top and O.K. are relevant to damages. The documents not produced by Big Top, particularly purchase orders and cost of production figures, and the unanswered 30(b)(6) questions are indispensable to the resolution of these issues, and their absence strongly suggests that only dismissal adequately remedies the violations.

 Dismissal is obviously the most extreme remedy, and although district courts assess sanctions in their discretion, several guiding principles appear in the caselaw.

"Willful disobedience" of court orders is required for the sanction of dismissal. *See Velazquez–Rivera v. Sea–Land Serv. Inc.,* 920 F.2d 1072, 1076–77 (1st Cir.1990). Additionally, a finding of "flagrant bad faith" by a party or "counsel's callous disregard" of its client's responsibilities supports the dismissal sanction. *National Hockey League,* 427 U.S. at 643, 96 S.Ct. 2778; *see also Spiller v. U.S.V. Labs.,* 842 F.2d 535, 537 (1st Cir.1988) (affirming dismissal where, "[o]n at least three different occasions, the plaintiff ignored court orders without justification or explanation"). When a case "reflects a persistent pattern of disregarding or disobeying the requirements of the Federal Rules of Civil Procedure, the Local Rules of the ... District Court and explicit court orders," dismissal may be employed in the Court's discretion. *Morgan v. Massachusetts Gen. Hosp.,* 901 F.2d 186, 195 (1st Cir.1990). Though resolution of cases on the merits is obviously preferable, a litigant who "willfully violated procedural rules and orders of the district court" is not "entitled to have his case heard on the merits." *Id.*

In addition to the centrality of the violated discovery orders to the case, Big Top's conduct demonstrates a callous disregard of its discovery obligations. Attorney Frankel and Ranney Sr. willfully disobeyed my order to produce "forthwith" all the documents that Magistrate Judge Alexander had specifically ordered produced, with the intention to make the renewed 30(b)(6) deposition effectively meaningless. Ranney Sr. testified that he was part of the "collective effort"[9] to compile documents, and I conclude that he willfully and in bad faith disobeyed my order to provide meaningful 30(b)(6) testimony either by claiming not to know the answers to basic questions or by claiming an inability to produce someone who did know the answers. *See Guex v. Allmerica Fin. Life Ins. & Annuity Co.,* 146 F.3d 40, 43 (1st Cir.1998) (dismissing for several reasons, including violation of a magistrate judge's direct order to produce documents requested in a defendant's subpoena duces tecum, because the corporate officer "feigned his inability to control his company's conduct and, thus, ...

acted in bad faith."). Finally, this was not a one-time indiscretion. At every turn, Big Top and its attorney fought the court process, making it difficult to proceed to the merits of the case. *See Velazquez–Rivera,* 920 F.2d at 1077 (holding that a "pattern of negligent behavior" rather than "relatively isolated" incidents of misconduct weighs in favor of dismissal).

In addition to the particular requirements for employing the dismissal sanction, the First Circuit warns that "dismissal should be employed only if the district court has determined that it could not fashion an 'equally effective but less drastic remedy.'" *Id.* at 1076. The Court, in fact, did fashion a less drastic remedy after finding a Rule 37(a) violation on March 18. Confident that scolding an attorney and a desperate plaintiff and imposing monetary sanctions would suffice, I took the next step of ordering Big Top to produce the documents Judge Alexander had already ordered produced and then to submit to and to take seriously renewed individual and 30(b)(6) depositions. This reasonable approach failed. Big Top turned over some documents but dragged its feet until defendants' counsel had no meaningful opportunity to review said documents before forming its deposition questions. The document production itself did not meaningfully allow defendants to frame a defense to Big Top's claims because it omitted key documents, such as machine production data and purchase orders, which could reasonably be expected to contain critical customer information.

No less painful sanctions are available. A fourth court order will put the Court in the posture of playing paper tigress. Monetary sanctions, according to Big Top's own dire description of its financial condition, are unavailing. Indeed, to my knowledge, to date, the sanctions I previously imposed have remained unpaid. Witness preclusion of Ranney Sr. and Roberts is tantamount to a dismissal, as they have information critical to plaintiff's ability to meet its burden. Also, as the discovery violations affect both liability and damages on the central claims, dismissing a portion of the claims is not practicable.

9. Ranney Sr. Mar. 28 Dep. Tr. at 11:17–21.

Finally, the deposition "performance" mocked my order. Plaintiff, to sum up, was intent on defying this Court's discovery orders until the discovery deadline, apparently surmising that March 31 would provide safe harbor and that then it could coast to trial victory. An analysis of the transcripts supports defendants' argument that plaintiff was filibustering by producing overly verbose, evasive answers to simple questions and by counsel's practice of lengthy objections and commentary despite my March 18 order to her not to engage in such behavior. Big Top received notice on several occasions "of the adverse consequences which would follow a failure to comply" with the Court's orders. *Spiller*, 842 F.2d at 537.

■ To focus on these specific and defined violations of court orders really does not do justice to Big Top's over-the-top behavior. If a Rule 37(a) order is in effect, "then the totality of the plaintiffs' conduct would justifiably weigh in the balance when the court select[s] a sanction for an ensuing violation of that order." *R.W. Int'l*, 937 F.2d at 19. If there has been such a violation, a court may "look[ ] to the rest of the record and consider[ ] the overall behavior of the guilty party to determine whether the particular sanction [is] just." *Id.* Dismissal is all the more appropriate if there is a "long procedural history indicating protracted inaction or deliberate delay" and where the district court has "expended significant time in this case." *Velazquez–Rivera*, 920 F.2d at 1077.

In fact, the failure to turn over documents and to answer highly relevant questions about the company are only the most concrete disruptions of the judicial process by Big Top. Ranney Sr. frequently interjected himself into the Court hearings and depositions.[10] Sometimes, he even overruled his own counsel's instructions not to answer. (Ranney Sr. Mar. 28 Dep. Tr. at 279:1–13; 98:5–14.) During the deposition of Douglas Mackay, Ranney himself asked the deponent questions over counsel's objections. My experience with this case over the past sixteen

---

10. Q. Mr. Ranney, I'll ask you a question.
A. Before you ask a question—
Q. Please, sir, do you have financial records as you've just described to me for any of the months of 1998; yes or no?
A. Your question—
MS. FRANKEL: You don't have to just answer yes or no if more than a yes or no answer is necessary.
Q. I'm only asking whether you have those records; yes or no, please, sir?
A. Before I answer your question, I would like to see a little bit of civil behavior. All right, I have been trying to answer your questions and I will continue to answer your questions. If they require a lengthy answer I will give them. I'm only trying to give you information. You shouldn't try to stop me from giving you information and I'm going to continue again in the vain that I had started before you interrupted me, and I'd appreciate it if Mr. Draper stays out of this conversation, or stays out of this area of question from this point forward. I think myself and the questioning attorney can get to the root of everything he's looking for if you just allow me to continue without badgering or interrupting anybody.
Bottom line is this: As I was trying to explain, this entire year, in fact we can start a year ago in January when that machine first appeared, that fraudulent machine first appeared, we have been involved in a lawsuit. It's only us against the defendants. To give you an example what we're up against, the other day it took us three hours to open our mail.

MR COMSTOCK: Miss Frankel, please would you tell the witness to let us ask the questions.
MS. FRANKEL: I will ask you to stop interrupting him like I told you to stop interrupting William. I'm instructing you to do that. Stop interrupting him because you don't like his answer.
MR. COMSTOCK: It's not relevant.
MS. FRANKEL: It's perfectly relevant to your question. Stop engaging me in dialogue. Stop interrupting him or we're going to get a court order to stop you from taking any further depositions in this case.
MR. COMSTOCK: I'm entitled to a simple answer to a simple question.
MS. FRANKEL: I'm instructing you to finish your answer in complete detail.
MR COMSTOCK: When we are operating under a limited time frame, you don't have a right to interrupt the deposition.
MS. FRANKEL: You use that as an excuse because of limited time frame and engage me in needless fights.
MR. BOTTI: Attorney Frankel, do you have to stand up and yell? Can you just talk in a normal tone of voice?
MS. FRANKEL: No, not when he interrupts my witness. I want you to complete your answer.
Q. Mr. Ranney, can you tell me this –
MS. FRANKEL: Do not answer his question unless you have a chance to finish.
Ranney Sr. Mar. 28 Dep. Tr. at 33–35.

months leads me to conclude that Ranney was involved in the decisions not to disclose certain information to the opposing party. He decided, on his terms, what information was relevant to what he saw as clearly "illegal actions" by the defendants, and his attorney, Frankel, went along. Together, they employed a two-pronged strategy of convincing the Court to expedite the trial schedule lest Big Top go out of business while at the same time dragging their feet on any disclosures that might be harmful to them, reasoning that any information withheld until the discovery cutoff would be safe. *See Damiani v. Rhode Island Hosp.*, 704 F.2d 12, 16 (1st Cir.1983) ("Not only was there willful disobedience of the court's order, but the plaintiff's attorney arrogated control of discovery to [her]self and changed the date of compliance to suit [her] own convenience and that of [her] client."); *Spiller*, 842 F.2d at 537 ("[B]ased on the history of foot-dragging evident from the record, it is difficult to draw any other inference but that plaintiff did not intend to comply unless absolutely forced to do so.").

All the while, the behavior of the attorney was obstructive and uncivil. The American Bar Association has well-stated the reason why the Court sees dismissal as the remedy of choice in this case:

> Conduct that may be characterized as uncivil, abrasive, abusive, hostile or obstructive impedes the fundamental goal of resolving disputes rationally, peacefully and efficiently. Such conduct tends to delay and often deny justice.

American Bar Assoc., *Guidelines for Litigation Conduct*, Aug. 1998, Preamble. This Court has the "inherent power to sanction parties for litigation abuses." *John's Insulation, Inc. v. L. Addison and Assoc., Inc.*, 156 F.3d 101, 108 (1st Cir.1998). Also, because the Court has "the obligation to assure the proper conduct of proceedings in his or her court," a trial judge must "retain the power to comment, sternly when necessary, on a lawyer's performance." *In re Lawrence G. Williams*, 156 F.3d 86, 92 (1st Cir.1998) (en-

couraging judicial candor in the context of imposing sanctions for attorney misconduct).

Big Top's attorney proved difficult to deal with. Her documented conduct in depositions included coaching her client's testimony, storming out without cause, hanging up on counsel, insulting counsel, and even questioning the religious beliefs of a deponent.[11] While the stress of litigation can understandably result in an isolated uncivil outburst, the appropriate follow-up is "I'm sorry." Alternatively, counsel should seek the advice of a mentor who is more experienced. However, no deposition should have unprofessional exchanges or yelling matches like the ones that occurred here. Such behavior places the Rule 37 violations in context. In fairness, I add that Big Top's counsel was under a lot of pressure.

 The sanction of dismissal, which includes deterrence of similar abuses by other attorneys, visits the "sins of the attorney" on the client as well. *Damiani*, 704 F.2d at 16–17; *see also Farm Constr. Servs., Inc. v. Fudge*, 831 F.2d 18, 21 (1st Cir.1987). The sanction of dismissal is "available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League*, 427 U.S. at 643, 96 S.Ct. 2778, *quoted in Guex*, 146 F.3d at 41. In any event, in this case visiting the abuses of the lawyers on the client is not unfair because the Court remains convinced that Ranney Sr. was no wallflower.

Big Top was given ample opportunity to respond orally to the motions to dismiss and then an additional six weeks to respond in writing. *See Damiani*, 704 F.2d at 17 (encouraging fair opportunity to respond). In fact, partially as a result of the hearing, O.K.'s failure to disclose documents, fatal to its motion to dismiss, was revealed. The Court concludes that dismissal is fully justified due not only to the specific subject matter of the Rule 37 order violations, but also because of the totality of the behavior of Big

---

**11.** *See* David Graham Apr. 10 Dep. Tr. at 70:13 ("You claim to be a born-again Christian, don't you?"); 70:24 through 71:1 ("I want to know, Mr. Graham, how you can reconcile what you did to the plaintiffs in this case with your religious beliefs.").

Top and its counsel and the unavailability of lesser sanctions. Selectivend and Wal–Mart will be dismissed as defendants as a result.

### D. *O.K.'s Motions*

██ O.K. will be treated differently, however. O.K. does *not* come to this Court requesting dismissal with clean hands. Big Top requested the following documents, among others, from O.K. on July 15, 1997:

1. Any documents which evidence or relate to the total dollar sales and/or number of sales of each of the following OK Vending machines, from 1995 to the present:

 (a) Circus World;

 (b) Gumball Coaster; and

 (c) Roadrunner.

2. Any documents which evidence or relate to the name, address and telephone number of each person and/or entity that purchased *the "vending machines" identified in documents request number 1,* and the date upon which each sale was consummated.

(Emphasis added). O.K., even as of the April 27 motion to dismiss hearing, had not produced purchase orders on the three machines, despite its own insistence that Big Top's purchase orders were indispensable to the case. Its excuse, given orally with a straight face and then again in writing, is that the reference in Request # 2 to Request # 1 meant that only documents indicating "total dollar sales" were required and, thus, that purchase orders were outside of the second request. O.K.'s argument is facially unsupported and disingenuous. The internal reference merely incorporates the lists of the three machines, and purchase orders were clearly encompassed in the second request. Furthermore, O.K. dragged its feet almost as much as Big Top did in regard to producing unredacted copies of its customer list.

Unlike Big Top, O.K. was not under a specific court order to produce purchase orders. Magistrate Judge Alexander ordered O.K. to produce requested documents generally subject to a protective order. (M.J. Order at 2–3.) The order lacks the specificity with regard to O.K. that is required as a predicate for Rule 37 sanctions. *See R.W.*

*Int'l,* 937 F.2d at 17. Nevertheless, the Court concludes that the withholding of documents was done in a bad faith game of "chicken" with Big Top, and it refuses to allow O.K. to benefit from Big Top's indiscretions when it has not acted in a manner that advanced the truth-seeking function of discovery. (Ranney Sr. Mar. 6 Dep. Tr. at 20–21 (O.K.'s counsel admitted he had agreed to provide documents ordered by the magistrate judge on March 6, 1998, but claimed that due to a lost fax the documents could not be compiled for one week).)

O.K. has not filed a substantive motion for summary judgment. It did, however, file a motion to join the summary judgment motions of co-defendants Selectivend and Wal–Mart *late,* on April 24, one week after the deadline for dispositive motions. Even if the motion had been filed by the deadline of April 17, the Court would have been extremely unlikely to allow O.K. simply to join the summary judgment motions of the others because of the different factual relationship each defendant has with Big Top and the probability of different results. I said at the hearing on April 27 that O.K. conceivably could benefit collaterally from the Court's treatment of the summary judgment motions. Since both motions are moot due to the allowance of Selectivend's and Wal–Mart's motions to dismiss, no such benefit attaches.

This show must go on, with fewer characters. Following a scheduling conference in the near future, Big Top and O.K. (both parties with new counsel) should anticipate the reopening of discovery (meaningfully performed, this time around the ring) with a trial to follow.

### ORDER

(1) Wal–Mart's motion to dismiss as sanction is *ALLOWED* with prejudice;

(2) Selectivend's motion to dismiss as sanction is *ALLOWED* with prejudice;

(3) O.K.'s motion to dismiss as sanction is *DENIED;*

(4) O.K.'s motion to join co-defendants' summary judgment motions is *DENIED* as untimely;

(5) Wal–Mart's and Selectivend's motions for summary judgment are moot.